**IN THE UNITED STATES DISTRICT
COURT FOR DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Cause No. CR 25-45-GF-BMM** |
| Plaintiff, | |
| vs. | **ORDER ON**<br>**MOTION TO DISMISS THE**<br>**INDICTMENT** |
| **ABRIANNE LILLIAN DESERLY,** | |
| Defendant. | |

**INTRODUCTION**

Defendant Abrianne Lillian Deserly ("Deserly") moves the Court to dismiss the Indictment (Doc. 1) pursuant to Fed R. Crim. P. 12(b)(3)(B). (Doc. 57.) Deserly argues that the Government and law enforcement failed to preserve and collect exculpatory evidence and/or potentially exculpatory evidence. (Doc. 58 at 1.) The Government opposes the motion. (Doc. 73.) The Court held a hearing on February 24, 2026. (Doc. 86.)

**FACTUAL BACKGROUND**

The Indictment charges Deserly with one count of second-degree murder in violation of 18 U.S.C. §§ 1153(a) (Indian County), § 1111 (Murder), and § 2 (Principals/Aiding & Abetting). The Indictment alleges that on or about February 26, 2025, in Wolf Point, in the exterior boundaries of the Fort Peck Indian

1

Reservation, Deserly and her co-defendants unlawfully and with malice aforethought, killed John Doe and aided and abetted the same. (Doc. 1.)

Fort Peck Tribal Police were dispatched to an abandoned building on February 26, 2025. The report noted the possibility of a dead person in the abandoned building on 1st Avenue South in Wolf Point, Montana. Fort Peck Tribal Officer James Combs and Wolf Point City Police Lieutenant Enrique Morales went to search the building. Combs located a deceased male lying face down in a pool of blood. Tribal Criminal Investigator Eugene Stump ("CI Stump") secured the scene after arrival. Roosevelt Couty Deputy Coroner Joe Reinhart also arrived on the scene. CI Stump and Reinhart had the deceased male's body transported to Billings, Montana for an autopsy. The autopsy identified the deceased male as Gifford Standing, an enrolled member of the Fort Peck Tribes. Both tribal law enforcement and Federal Bureau of Investigations ("FBI") were involved in the investigation revealed the identity of the deceased on February 26, 2025.

Witnesses alleged that four people, Deserly, Calvin Lester Jr. ("Lester"), Dillon Wetsit ("Wetsit"), and Michael Menz, had assaulted Standing to his death in the abandoned building. Video surveillance located across the street from the abandoned building showed four people walking together on the night of February 26, 2025. (Doc. 73 at 6.) CI Stump reviewed this footage on February 27, 2025. (*Id.*)

2

Tribal Officer David Dale conducted a witness interview on February 27, 2025. (Doc. 73 at 6.) The witness, A.C., told Tribal Officer Dale that her brother, Deserly's co-defendant, Lester, was with Deserly. (*Id.*) A.C. indicated to Tribal Officer Dale that Deserly told her at work that she had killed somebody. (*Id.*)

Law enforcement officers arrested Wetsit, one of Deserly's co-defendants, on February 27, 2025, on an unrelated warrant for having violated a tribal protection order. (*Id.*) Wetsit's arrest on February 27, 2025, came after Wolf Point police officers had been dispatched to remove two males from the laundromat. (*Id.*) Wetsit mentioned to Tribal Officer Dale while being transported to the Fort Peck Adult Correctional Facility ("Tribal Jail") that he would like to speak to investigators about the death that had occurred on 1st Ave South. (*Id.* at 7.) Tribal Officer Dale responded that he would let the criminal investigator know. (*Id.*) Tribal Officer Dale told Wetsit that someone would come speak to him about the death once he was sober. (*Id.*)

Tribal Officer Dale transported Wetsit from Wolf Point to Poplar, Montana. (*Id.*) Tribal Officer Nicolas Greybull booked Wetsit into the Tribal Jail in Poplar on February 27, 2025. (*Id.*) Wetsit complained to Officer Greybull at his booking into Tribal Jail that his feet were hurting. (*Id.*) Tribal Officers used trauma shears to cut off Wetsit's boots which revealed blisters on Wetsit's feet. Tribal Intake Correctional Officer Coral Greybear testified that Wetsit's feet appeared swollen,

deplete of color, and like they had been soaking under water. Greybear discarded the boots worn by Wetsit at his booking into Tribal Jail on February 27, 2025. (Doc. 73 at 8.) Greybear explained that he had disposed of Wetsit's boots because the boots were considered a "medical hazard." (*Id*. at 7-8.)

CI Stump and FBI Special Agent James Atchley ("SA Atchley") conducted an interview with Wetsit on February 28, 2025. (Doc. 75 at 4.) SA Atchley asked Wetsit about the boots he was wearing during the interview. (*Id*.) Wetsit informed SA Atchley that the boots had been cut off during his booking into Tribal Jail. (*Id*.) Wetsit denied that blood would be found on the boots. (*Id*.) Both CI Stump and SA Atchley testified that they believed that Wetsit's boots were being kept and preserved at the Tribal Jail.

CI Stump asked Tribal Jail officers about the whereabouts of Wetsit's boots on March 11, 2025. (Doc. 58 at 3.) Tribal Correctional Officer Jessica Kirn indicated to CI Stump that Greybear informed Kirn that she was instructed to throw away the boots the night of Wetsit's booking. (*Id*.) CI Stump testified that he went to the Tribal Jail on March 11, 2025, to search for Wetsit's boots but was unsuccessful in finding or collecting them.

CI Stump and SA Atchley interviewed Ervin Diserly, an alleged witness to the killing of Standing, on February 28, 2025. (Doc. 58-1 at 9; Doc. 73 at 8.) Diserly told CI Stump and SA Atchley that Deserly was "stomping [the victim's]

4

face in" while three other men were "minding their own business." (Doc 58 at 11; Doc. 72 at 8.) Diserly described Deserly as using her heel to strike Standing. (Doc. 73 at 8.) Deserly contends that she was wearing tennis shoes on the night in question that could not have caused the C-shaped injuries on Standing's face. (Doc. 75 at 6-7.) Deserly asserts instead that Standing's C-shaped injuries are consistent with the metal shoelace eyelet's that would have been found on Wetsit's boots. (Doc. 58-1 at 4.)

Diserly later turned over a cell phone to SA Atchley on March 12, 2025. (Doc. 58-1 at 8.) Diserly informed CI Stump and SA Atchley that he had found the phone upstairs in the abandoned building near where Standing's body had been located. (*Id.*) The cell phone appeared to have dried blood on it. Investigators had photographed the bloody cell phone at the scene but had not collected it. SA Atchley testified that the FBI's examination of the cell phone revealed the cell phone belonged to another person, who alleged that Deserly had stolen it from her at knife point before the killing of Standing.

Deserly takes issue with multiple pieces of evidence that the Government allegedly failed to collect, or preserve, including Wetsit's boots. Deserly argues that the Government failed to collect, preserve, and test a metal pipe that was pictured at the scene. Deserly asserts that the Government also failed to collect, preserve, and test the bloody cell phone under Standing's body and samples of

blood that were pictured at the scene. Lastly, Deserly contends that law enforcement failed to secure the crime scene and that unauthorized homeless persons continued to use the abandoned building called "the Hideout" after the death of Standing.

## LEGAL STANDARD

The Due Process Clause of the Fourteenth Amendment requires the government to preserve evidence that is material to the defense and possessed by the government. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). The government's duty to preserve extends to evidence in the possession of law enforcement officers working on the government's behalf. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). A court may dismiss an action when the government's destruction of, and/or failure to preserve, evidence undermines the defendant's ability to receive a fair trial and violates the defendant's due process rights. *See United States v. Cooper*, 983 F.2d 928, 931–33 (9th Cir. 1993).

## DISCUSSION

### I.    The Government's failure to preserve Wetsit's Boots

Deserly argues that the Government's failure to preserve Wetsit's boots violates her constitutional right to due process. (Doc. 58 at 2.) The government violates a defendant's due process rights when it loses or destroys evidence in its possession if the evidence is materially exculpatory. *California v. Trombetta*, 467 U.S. 479, 488–89 (1984). Constitutionally materially exculpatory evidence means

6

evidence (1) that's exculpatory value was apparent before its destruction and (2) is of the nature that a defendant could not obtain comparable evidence by other reasonably available means. *Id.* The Court will address whether Wetsit's boots were materially exculpatory to Deserly's defense as the Government possessed Wetsit's boots for a period of time.

### A. Whether Wetsit's boot were materially exculpatory to Deserly's defense.

Exculpatory evidence tends to prove the innocence of the defendant. *Amado v. Gonzalez*, 758 F. 3d 1119, 1134 (9th Cir. 2014). Neither party questions the potential exculpatory value of Wetsit's boots to Deserly's defense. Law enforcement officers collected the shoes/boots of the other co-defendants in this case when arrested due to the allegations that the assailants had used their feet and hands to assault Standing. Evidence from Standing's autopsy also suggests that Standing had injuries that could be consistent with injuries from the shoelace eyelets that would be present on Wetsit's boots. (Doc. 58-1 at 4.)

The loss of Wetsit's boots at the Tribal Jail deprives Deserly of the opportunity to argue that Wetsit caused the deathly blows to Standing using his boots. Forensic testing may have been able to match the wounds on Standing's head and neck with metal shoelace eyelets on Wetsit's boots. Deserly remains limited to arguing that Wetsit's boots may have caused the C-shaped injuries on Standing's face and neck without the physical evidence to show the jury. Deserly

also has lost the chance to match any blood or other DNA-related material on Wetsit's boots to Standing.

### B. Whether the government knew of Wetsit's boots apparent exculpatory value before destruction.

It does not appear that the Government knew the apparent exculpatory value of Wetsit's boots at the time the Tribal Jail officers threw them away on February 27, 2025. The Government at that time possessed only limited information that four people may have been involved in the killing of Standing, as four people were observed on surveillance video near the abandoned building. The Government had no other information to implicate Wetsit in Standing's murder when tribal law enforcement booked Wetsit into the Tribal Jail. Tribal law enforcement had booked Wetsit into the Tribal Jail on an unrelated tribal arrest warrant for having violated a protection order. Wetsit's statement to Tribal Officer Dale that he would like to speak with someone regarding the death of Standing on the transport to the Tribal Jail on February 27, 2025, did not clearly make the exculpatory value of his boots known before their destruction. Wetsit did not mention that he wanted to speak to someone due to his involvement in Standing's death.

The Government's knowledge of the potential exculpatory value of Wetsit's boots became apparent during the interview with Wetsit on February 28, 2025. CI Stump and SA Atchley had reason after the interview to suspect that Wetsit was one of the four people observed in the surveillance video. The Government knew

at this time, February 28, 2025, that the suspected killer's boots would be important to the investigation and to any defense or claims of the co-defendants. SA Atchley specifically asked Wetsit about his boots during the interview. This question demonstrates that the Government knew, or reasonably should have been known, of the potential evidentiary value of Wetsit's boots. Tribal Jail staff had cut the boots off Wetsit's swollen feet and thrown the boots in the trash by the time the Government likely determined the boots' exculpatory value.

The facts also suggest that the Government did not act in bad faith in failing to preserve Wetsit's boots. The Government argued at the hearing that the officers assumed, consistent with the policies of the Tribal Jail, that the Tribal Jail staff had preserved the boots, along with Wetsit's other personal belongings, upon Wetsit's booking into the Tribal Jail. Deserly presented no evidence to contradict this claim. Deserly has failed to show that the Government intentionally destroyed Wetsit's boot "to gain some tactical advantage . . . or to harass [Deserly]." *Youngblood*, 488 U.S. at 57 (quoting *United States v. Marion*, 404 U.S. 307, 325 (1971)). The Government's destruction and failure to preserve Wetsit's boots does not constitute a violation of Deserly's right to a fair trial or due process rights.

The Court highlights the fact that the Government learned of the important evidentiary value of Wetsit's boots during Wetsit's interview with law enforcement on February 28, 2025. The Government failed to promptly attempt to

9

locate and potentially preserve Wetsit's boots. CI Stump made no effort to contact the Tribal Jail regarding the whereabouts of Wetsit's boots until 11 days later on March 11, 2025. The Government's failure to preserve Wetsit's boot does not rise to a constitutional due process violation because the Government likely did not know of Wetsit's boots exculpatory value at the time of their destruction.

The Court determines that an appropriate sanction may be warranted, however, due to the Government's failure to promptly retrieve Wetsit's boots after learning of their potential evidentiary importance during the interview of Wetsit on February 28, 2025. The Government knew of Wetsit's boots' value one day following their disposal. It seems likely that Deserly may have been able to obtain the boots had the Government acted promptly in reaching out to the Tribal Jail on February 28, 2025, and in making attempts to recover Wetsit's boots. The Government's failure to take these prudent steps warrants a lesser sanction than dismissal of the Indictment as analyzed below.

## II.      The Government's failure to collect evidence such as a metal pipe, cell phone, and blood samples

The loss or destruction of only potentially useful evidence may give rise to a due process violation in particular circumstances. *Youngblood*, 488 U.S. at 58; *Zaragoza*, 780 F. 3d at 977. Law enforcement's duty to preserve evidence in its possession under *Trombetta* generally does not extend to collecting or obtaining potentially exculpatory evidence. *Miller v. Vasquez*, 868 F. 2d 1116, 1119 (9th Cir.

1989) (citing *California v. Trombetta*, 467 U.S. 479, 489 (1984)). The Ninth Circuit has held that a failure to collect potentially exculpatory evidence may violate a defendant's due process rights if accompanied by bad faith. *Miller*, 868 2d at 1119

The Court will evaluate the other pieces of evidence such as the metal pipe, cell phone, and blood, under the standard of potentially exculpatory because the Government did not initially collect these pieces of evidence from the scene or have these pieces of evidence in their possession. *Trombetta's* materially exculpatory analysis applies only to circumstances when the government gathers the evidence but fails to preserve the evidence in its possession. *See Miller*, 868 F.2d at 1119.

### A. Whether the evidence the Government failed to preserve or collect was potentially exculpatory to Deserly.

Potentially useful evidence means "evidentiary material of which no more can be said then that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood,* 488 U.S. at 57. The evidence that the Government failed to collect at the scene including the cell phone, metal pipe, and blood samples likely was potentially useful to Deserly. The coroner concluded that Standing's injuries on his face appeared consistent with blunt force trauma from the use of a metal pipe or boot. Testing of the metal pipes photographed at the scene could have established that Deserly's DNA was missing

from the object and even may have indicated the presence of Standing's DNA and another person's DNA. To have such evidence and testing on the metal pipe could have been helpful to Deserly's defense that another co-defendant had been responsible for the murder of Standing.

Multiple witnesses have come forward to say that Deserly has implicated herself in the killing of Standing. Additional testing on the metal pipe may not have completely exonerated Deserly for the charges in the Indictment, specifically the aiding and abetting charge. The Government has provided evidence that places Deserly at the scene of the crime, including the surveillance video and witness statements.

The collection of blood samples that were photographed under Standing's body potentially could have offered some helpful evidence to Deserly. The blood samples would have been helpful if they revealed DNA from a co-defendant and no DNA from Deserly. Deserly offers no facts to suggest that another co-defendant's DNA or blood would have been discovered in the dried blood pools. The photographs of Standing's body appear to show that the blood pools originated from Standing's own injuries. Although potentially useful to Deserly's defense, the additional testing and sampling of the pools of blood around Standing likely would not have exonerated Deserly entirely on the charges contained in the Indictment.

Lastly, the cell phone that law enforcement officers photographed at the

scene but failed to collect potentially could have been useful evidence for Deserly if information on the phone indicated that another person had killed Standing. Deserly does not argue that such information exists. Other people, not implicated in Standing's death, possessed the cell phone until someone provided the cell phone to SA Atchley on March 12, 2025.

The Government's possession of the cell phone minimizes any concerns Deserly may have about the failure to collect the cell phone at the scene of Standing's murder. The Government has indicated to Deserly that additional testing could be conducted to determine if any evidence of tampering of the cell phone exists between the time of the killing and when the FBI gained control over the cell phone on March 12, 2025. Unlike the other pieces of evidence that the Government did not collect, such as the metal pipe and blood samples, the cell phone remains in the FBI's possession and can undergo additional testing. Deserly has not been deprived of the right to a fair trial. Deserly retains the opportunity to have further testing done on the cell phone and inspect its contents.

The Court also notes that other evidence relating to the cell phone appears to prove unhelpful to Deserly. The owner of the cell phone indicated to the FBI that Deserly had stolen the cell phone from her before Standing's death. This information suggests that additional testing on the cell phone instead may prove detrimental to Deserly's defense at trial.

In conclusion, the evidence that the Government failed to collect from the scene of Standing's murder, or failed to preserve, likely could have undergone additional testing to provide potentially helpful information to Deserly's defense. The additional testing conducted on the metal pipe and blood samples could have provided more evidence to suggest that one of Deserly's co-defendants murdered Standing, and that Deserly did not deliver the force that caused Standing's death. The additional testing of the metal pipe, cell phone, or blood could not exonerate Deserly entirely, however, from her alleged involvement and aiding and abetting in the murder of Standing. The surveillance video places Deserly near the scene of the crime close to the time of Standing's death. Several witnesses have placed Deserly at the scene of Standing's death and have provided statements that Deserly played some role in causing Standing's death.

**B. Whether the Officers acted with bad faith in failing to collect the metal pipe, cell phone, or blood samples**

The Ninth Circuit has concluded that law enforcement's failure to *collect* potentially exculpatory evidence does not violate due process unless the failure to collect was done in bad faith. *Miller,* 868 F. 2d at 1120 (emphasis added). Bad faith consists of "official animus" or "a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. at 488-89. Bad faith "requires more than mere negligence or recklessness." *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011).

14

The record before the Court does not compel a conclusion that the Government acted with bad faith in failing to collect the various pieces of evidence at the scene of Standing's murder, such as the cell phone, metal pipe, or blood samples. Deserly's complaints about the Government's and the various law enforcement officers' actions, or inactions, in collecting the various pieces of evidence more closely resemble possible negligent or reckless behavior.

The Government contends that it did not know of the metal pipe's potentially exculpatory value until nine months later when a retired deputy classified a metal pipe as a potential weapon used in causing Standing's death. (Doc. 14 at 18.) Testimony at the hearing also suggested that the metal pipes photographed in the abandoned building were located throughout the building, not necessarily near Standing's body. The Government likely believed at the time that the pools of blood under Standing contained only Standing's blood given Standing's injuries and the position of blood being directly where the injuries stemmed. The facts do not show that the Government intentionally chose not to collect blood samples to hinder or suppress exculpatory evidence from Deserly.

The Government's failure to collect the cell phone under Standing's body also does not appear to have been done in bad faith. Deserly remains able to have additional testing done on the cell phone as it is now in the possession of the FBI. This availability for testing minimizes any potential prejudice Deserly may have

15

suffered if the cell phone no longer was in the FBI's custody and control. The record contains no evidence that the Government or law enforcement acted in bad faith in failing to collect certain pieces of evidence.

The conclusory allegations that the law enforcement officers acted in bad faith prove insufficient to raise a colorable bad faith claim. The Court acknowledges that the law enforcement officers' conduct possibly may be characterized as negligent or reckless. Any concerns Deserly has about the law enforcement officer's negligent or reckless conduct regarding collection of evidence from the scene of Standing's death may be addressed on cross-examination.

### III.    Deserly's appropriate remedy for the Government's failure to collect and preserve evidence.

The Court declines to impose a sanction of dismissal having found that the Government's evidence preservation or collection inadequacies did not rise to the level of a constitutional due process violation. A review of the record suggests that the imposition of a lesser sanction proves appropriate under these circumstances due to the Government inadequate efforts to preserve Wetsit's boots after having obtained knowledge of their exculpatory value during Wetsit's interview with law enforcement on February 28, 2025. A court still may impose sanctions such as suppression of secondary evidence and/or an adverse jury instruction even if the government's failure to preserve or collect evidence does not rise to the level of a

16

constitutional due process violation. *United States v. Nelon*, 2023 U.S. Dist. LEXIS 220614. at *9 (D. Nev. 2023).

A court must weigh the quality of the government's conduct against the prejudice to the defendant in determining the appropriate remedy. *Id*.; *See also United States v. Sivilla*, 714 F.3d 1168, 1173–74 (9th Cir. 2013). A court may consider a number of factors when assessing the quality of the government's conduct including the following: "whether the evidence was lost or destroyed while in the government's custody, whether the government acted in disregard of the defendant's interests, whether the government was negligent, whether the prosecuting attorneys were involved, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification." *Nelon*, 2023 U.S. Dist. LEXIS 220614, at *9 (quoting *United States v. Robertson*, 895 F.3d 1206, 1213 (9th Cir. 2018) (citations omitted)). A court also may consider the following factors when assessing the prejudice against the defendant: "the centrality and importance of the lost evidence to the case, the probative value and reliability of secondary or substitute evidence, the nature and probable weight of inferences and kinds of proof lost to the accused, and the probable effect on the jury from the absence of the evidence." *Nelon*, 2023 U.S. Dist. LEXIS 220614, at *10 (citing *Robertson*, 895 F.3d at 1214).

The Court determines that an adverse inference instruction, or instructions,

17

would provide an appropriate remedy to address the harm to Deserly from the Government's failure to preserve Wetsit's boots. The Court determines, at this point, that vigorous cross-examination by Deserly provides the appropriate remedy regarding the Government's failure to collect the cell phone, blood samples, and any metal pipes at the scene of Standing's death. The Court will solicit proposed adverse inference instructions from the parties closer to the time of trial. The proposed instructions should address the loss of Wetsit's boots. The Court also will solicit proposed instructions regarding the cell phone, blood samples, and lead pipe. The Court remains unpersuaded at this point, however, that the failure to gather these other items warrants such an instruction. The Court remains open to further argument as discovery progresses.

## ORDER

Accordingly, **IT IS ORDERED** that Deserly's Motion to Dismiss Indictment for Failure to Preserve Evidence (Doc. 57.) is **DENIED**. The parties shall provide any proposed adverse inference instructions no later than 30 days before the scheduled trial date.

DATED this 13th day of March 2026.


Brian Morris, Chief District Judge
United States District Court